## Case No. 9,477.

### The MERRIMAC.

[Blatchf. Pr. Cas. 585.] [1]

District Court, S. D. New York. Jan., 1864.

PRIZE—COMMISSIONERS — COSTS—COMPENSATION—CUSTODY FEES.

1. The question of the costs taxable to the prize commissioners considered.

2. The act of March 25, 1862 (12 Stat. 374), discussed as to the compensation provided by it for the prize commissioners.

---

[1] [Reported by Samuel Blatchford, Esq.]

3. The tariff of allowances to the prize commissioners, prescribed by the court under that act, explained.

4. The act of July 17, 1862 (12 Stat. 608), restricting the compensation to each prize commissioner to $3,000 per year, discussed.

5. The difficulty of carrying out the statutory provisions as to the compensation of the prize commissioners set forth.

6. A prize commissioner cannot have taxed to him custody fees in respect of a vessel.

7. Custody fees to a prize commissioner, in respect of a cargo, are a personal allowance to him for an individual trust executed by him. No third person is authorized to assume such custody, and a charge by a prize commissioner of such fees, where his possession of the cargo was merely constructive, and not personal, will not be allowed.

8. The court refused to allow to a prize commissioner a charge of one per cent. on the proceeds of a vessel and cargo, as custody fees, for holding them in possession less than thirty days, and until they came into the custody of the marshal, on a warrant of arrest.

BETTS, District Judge. A list of items for allowance or taxation in this cause was submitted to the court by one of the prize commissioners in November last. It was authenticated by the deposition of the commissioner, in the usual form required for the allowance of the particulars charged. The bill amounts to $2,184.81, and is thus verified: "Henry H. Elliott, being duly sworn, says that the foregoing bill is true and correct according to the best of his knowledge, information, and belief; that the charge of $2,184.81, above mentioned, is not more than a just and suitable compensation for his services in this cause, as he verily believes. Sworn November 30, 1863." To the bill was also appended a consent in writing, signed by the United States district attorney, and also by Messrs. Sandford and Woodruff, Messrs. Owen, Gray & Owen, and Mr. Donohue, proctors, representing various captors in the suit, that the bill be taxed at that sum. But there is no evidence offered proving that special services of any description were rendered, or liabilities incurred, by the commissioner, in consequence of the custody of the cargo. One item charged in the bill was of this tenor, the whole being in print, except the sums and the times of the services, which were filled in in writing: "Custody fees for taking and holding the prize property until it passed into the charge of the marshall, being less than thirty days, the same fees as are allowed by law to him for custody fees, viz., one per cent. on $202,741.16; the gross proceeds thereof, $2,027.41." The court returned the bill to the commissioner for further explication of the grounds upon which the item was charged, particularly inquiring what period of custody or actual keeping of the cargo was covered by it. The evidence presented in support of the item in that respect consists of the affidavit of John Perry, an employé of the prize commissioners. He testifies

"that, in the employment of the prize commissioners, he went on board the above prize vessel when she was brought into this port, with a steamboat chartered for that purpose; that the prize was lying in Buttermilk Channel; that he found her cargo in a very bad condition, and very much scattered about over the vessel; that he took charge of the cargo, and took the vessel into the Atlantic docks, under the orders of the prize commissioner; that, on reaching the docks, she was boarded by the commissioner, and her hatches and cargo duly secured and sealed; that he remained on board and kept the vessel and cargo in custody, on behalf of the prize commissioners, for two days steadily, and thereafter was on board from time to time; that night watchmen were placed and retained on board by the commissioners during his absence, until the vessel was duly delivered into the custody of the marshal; that, under the orders of the commissioners, he took an accurate inventory, at the time, of all the loose and exposed cargo, and reported it to them; that, when he took charge of the cargo, it was exposed to pilfering and loss; and that the charge and custody of the cargo, by the commissioners, was necessary for its protection and safety." In the commissioner's bill of costs no special charges are entered for the services and disbursements spoken of by this witness, but a general charge, in print, of $25, is made in the bill, independent of the item of $2,027.41 particularly in question on this taxation, in the following terms: "Proceeding to the steamer, and taking possession of the captured property; taking information in reference to the situation and condition thereof, and whether bulk had been broken, &c.; placing the seals of the commissioners upon the hatches, &c.; examining into the safety of the property, and attending to the proper care and protection thereof, &c." So, also, an antecedent item in the bill provides compensation to the commissioners for the receiving, receipting, &c., of the prize effects and papers by them from the prize-master, $5.50.

The account of proceedings in the initiation of the suit in the district attorney's office represents that the prize was brought into this port July 28, 1863, and states that the libel was filed, and process thereon issued, on the same day; and the account from the marshal's office is, that the process was served the same day upon the vessel and cargo. This discrepancy, no doubt, arises from inaccuracy of memory in the deponent Perry, who states his personal action and that of the commissioners regarding the prize, prior to her arrest by the marshal, from his recollection at the time his affidavit was attested to, December 24, 1863, which was five months after the business in which he took part was transacted, and who cannot be expected to be as exact and reliable as to time as official entries or files. The court must, accordingly, regard the claim for compensation charged in the main item in question at $2,027.41 as resting virtually upon services constructive in character, and not flowing from official acts performed by the commissioner personally, or any responsibilities imposed upon him in the particular which is made the basis of this claim. The verification attested to by the commissioner, November 30, 1863, comprehends the whole bill. He says "that the foregoing bill is true and correct, according to the best of his knowledge, information and belief; that the charge of $2,184.81, above mentioned, is not more than a just and suitable compensation for his services in the cause, as he verily believes." The judgment of the commissioner may be proper, that, in the aggregate, his compensation for his entire services in the cause should be rated and allowed at $2,184.81. But that consideration cannot be regarded in determining the value of the particular items set forth as subjects for allowance. Each of them must be passed upon on the strength of its individual legality or intrinsic worth.

The consent of the United States attorney, and of the proctors for the three other war vessels co-operating in the capture of this prize, to the allowance of the above bill as stated by the commissioner, cannot justify the court in directing an amount to be paid to the commissioner out of the prize proceeds under the control of the court, which is not within the provisions or contemplation of the law which places that fund at the disposal of the court. This court has never considered that it possessed a rightful authority to devote to the officers of the court moneys arising out of the captures in prize proceedings, upon any other principle than those which govern the judiciary in the exercise of fixed directions of law, and with as careful an adherence to its spirit as if literally declared by congress in a code of specific fees.

Limiting the operation of these general remarks at present to the case of compensation of prize commissioners, the following positions of law are deemed to exist in the respect to the reward they are entitled to obtain for their services under the adjustment and determination of the court: The act of congress of March 25, 1862, is the first specific regulation made by positive law for the services and compensation of prize commissioners as public officers. The first section of the act designates various duties to be performed by them; and the third section appoints the method of their compensation. The statute is obscure and indefinite in its main features, and very difficult of satisfactory interpretation and execution. It points out no method by which the courts are to ascertain the value of the services rendered by these officers, none of which are rendered in the face of the court, or within its personal knowledge, or

are of a character likely to fall within its familiarity, nor does the law indicate what limitation, if any, shall be applied to the amounts to be awarded. The duties prescribed are partly legal, partly clerical, partly mercantile, and in part miscellaneous, and appertaining to the skill and experience of persons conversant with mercantile and general business transactions, and not supposable to be familiar to the individual experience of members of courts of justice, or to their professional or official pursuits or habits. The statute supplies no assistance to the court by a jury, assessors, referees, or other agencies, through which a reasonable approximation to the measure of "suitable and just compensation" called for may be attained. No existing course of public employment is known which can be recurred to for a precedent or ground of proceeding to guide the action of the court with any appreciable certainty, particularly none which gives countenance to the awarding of a compensation to possibly a mere day-laborer on a scale adequate to recompense a high trust assumed to have been performed by a bailee acting in an official capacity.

Immediately on the passage of the act of March 25, 1862, the court applied itself, with the active aid of one of the prize commissioners, a lawyer of long experience and high distinction in the profession, to searching for precedents in books of practice, and to gathering the usages of the government in the allowances made under its authority to its employés for services of a similar character and nature, with a view to frame a scheme of compensation which might comport with and carry into effect the enactments of the law. The main purpose was to adopt a tariff of allowances for the particular services imposed upon the commissioners, which should be commensurate with what was anticipated would be their probable character and value, and should keep in view a restriction of the allowance, in the aggregate, to five thousand or six thousand dollars per annum. Congress had evinced, by long-continued legislation, its purpose to restrict the compensation of its officers discharging the highest civil and judicial functions within this district to rewards not exceeding in gross the sum of $6,000 yearly; such as the justices of the supreme and circuit courts, the subtreasurer, the collector, the postmaster, the naval officer, the United States attorney, the marshal, &c.; whilst other officers, charged with multifarious and responsible trusts, and frequently guaranteed by heavy pecuniary sureties, were remunerated for services, not dissimilar in character from those expected from the prize commissioners, with less than $4,000 per year; such as the judge of the district court, the clerks of the circuit and district courts, and all the subaltern officers of every other department of public service, military, naval, and financial; the tenure of most of such offices being, like that of the prize commissioners,

at the discretion of the appointing power. In preparing the scheme of costs or compensation for the prize commissioners, the court was anxious to designate, with positiveness, the specific amount of allowance for each item of service, where it could be determined, from statutory appointments or well established usages, for like services in other situations under the government; and where such method could not be pursued, then to have the allowances claimed left to the judgment of the court upon specific evidence as to the quantum meruit, submitted for its guidance on taxation. The question arising on the present taxation is of the latter order. It was yet to be ascertained, from actual practice, whether the duties of the prize commissioners would be adequately paid by moderate additions to the stated fees appointed in the schedule arranged by the court, or whether, from year to year, the discretionary allowances reserved for special items must be varied so as to secure about the proposed compensation of five to six thousand dollars yearly, above necessary disbursements. The opportunity to meet that result substantially was expected to be obtained principally by the adoption of the provisions for unfilled blanks, one of which is now the subject of consideration. A provision of that kind had existed in the stated admiralty rules of this court since 1828. It was derived from a prior authority given by statute (1 Stat. 277, § 4), and was continued as a usage of the court of admiralty, in respect to the compensation of the marshal for the custody of seized goods, after the enactment ceased to be in force as to vessels and goods (Dist. Ct. Rules 49–51). All these allowances are subject to discretionary alteration by the court. Rule 52. But, independent of that qualification to the claim to this enhanced mode and rate of compensation, in prize proceedings, under the admiralty rules, the discretion which the court might exercise under section 3 of the act of March 25, 1862, is regarded as inhibited or limited by the act of July 17, 1862 (12 Stat. 608), which prohibits the annual salaries of prize commissioners being so increased, in any way, as to exceed, in the aggregate, the sum of three thousand dollars. Since the act of July, 1862, no amount of merit, or even losses, proved to have attended the performance of their duties by the prize commissioners, can authorize the court to enlarge their yearly emoluments above $3,000. The court is clothed with no power, by either act, to adjust that salary or maximum allowance, pro rata, upon prizes placed in the keeping of the commissioners during any other period than the particular year in which the services charged for were performed; and that, frequently, cannot be practically fulfilled by the court. Instances now exist in which cases of the condemnation of prizes in this court in the early stages of the war stand at this time undecided by the courts of appeal, and no execution can go from this court to

make out of other prizes the sum adjudged to the commissioners for their services in those cases. Nor, however ample to that end the proceeds of prize property captured and condemned within a year may be, in their general amount, can execution out of this court touch any portion of the fund, except that made out of the individual vessel in respect to which the services represented by the execution were rendered. So long as the captured prize proceeds exist, they must be made to contribute their proportion to this salary lien; and the demand cannot be lawfully attached to other prize proceeds held by the court. This state of facts leaves the court no means of fulfilling the direction of the two acts of March and July, 1862, but by an effort to compute conjecturally whether the current services of a commissioner, rated according to the tariff first adopted by the court, will amount to the sum of $3,000 for a particular year, which can alone be paid to him for his services during that year.

The court has not officially before it a return, in numbers, of the prizes seized and prosecuted to conviction, from July 17, 1862, to the close of the year directly succeeding, but a note taken from entries in one of the offices of the court shows that eighty-four arrests and condemnations were prosecuted during that period in this court. Evidence can be easily furnished from the papers in the respective causes, showing the exact amount of costs estimated in those suits; but it is assumed that the sum taxable against these eighty-four cases will average all of $100 in each case for the services of the prize commissioners, deeming both commissioners to be actually engaged in performing their duties. That will give $8,400 per year, which will be an excess of $2,400 above the legal compensation payable to the two, subject, of course, as is specified in the taxation, to the limitations prescribed by statute in the payment thereof. In the present case, however, it is to be observed, that only one of the commissioners presents, as claimant, a bill of services to be taxed. He cannot ask to have adjudged to him over $3,000 for a year. That is to be provided for out of pro rata assessments upon each of the 84 cases; and, in strictness, if the court could have made known to it the services performed in all of those suits, each case would be assessed, upon like items, exactly the same charges, up to a complement, from the whole, to the amount of $3,000, and nothing over that sum. Then, in this case of the Merrimac, the entire taxation to be levied for this bill would not, in all reasonable probability, surpass fifty or one hundred dollars. The terms of the two acts of March and July, 1862, do not supply the court the means to effectuate that intent of the law, by bringing together the proceeds of captures for any particular year and allotting them to discharge the assessment. That can be done only by the navy department. But, by the statute, each vessel is exempt

from liability for this class of services, except for the year in which the services were actually performed in relation to her. It is to be further noted that the prize commissioners are not created accounting officers to the treasury for surpluses of moneys paid over to them under orders of the court; and that the government possesses no remedy against them for excesses paid to them, if such exist, other than through personal actions therefor, as multifarious as the prizes from which the surplus payments are derived. The court, in administering these complex enactments, in the spirit of justice and equity, will, accordingly, be actuated by wo prominent considerations: First, to so adjust the assessments imposed upon the prizes for the payment of the prize commissioners as to fairly cover the salaries of the persons performing the duties of those offices whenever the amount subject to taxation is reasonably sufficient to that end; and, second, to avoid, with equal care, withdrawing from the beneficiaries to whom prize proceeds are devoted by law, after payment of the legal costs, moneys not lawfully payable to any officers of court. The court cannot, in principle, regard the government as any more empowered to divert such surpluses from their lawful destination to other uses, than the court or its officers are to misappriate the moneys under their special charge.

In review of all the legal and equitable considerations applicable to the particular item of taxation in question,—the charge of one per cent. commission on $202,741.16, the aggregate amount of the proceeds of the prize vessel and cargo in this suit, resulting in a charge of fees or compensation, as above stated, of $2,027.41,—I observe: 1. The value of the steamer, $65,000, does not fall within the contemplation of the admiralty rule respecting "custody fees." That rule relates to goods or personal effects solely; and the value of the ship must necessarily be excluded from the charge. With regard to the cargo, it is not proved that extra labor or expense was imposed upon the officer by its custody, as it was all retained on board the vessel. 2. Custody fees on the cargo, ($137,-741.16) are, in their nature, a personal allowance to the bailee, for an individual trust executed by him. The reading of the rule denotes that it contemplates the fulfilment of a special confidence imposed by the court upon an official person, intermediate the interposition of another official, the marshal, by a superseding authority. No third person is authorized to assume such custody. He must be the official, individually. The judge of the district receives the prize from the captors, under the directions of the prize law, and he only can designate the person who is to take into manual possession prior to its seizure by due process of law. The prize master has no authority to put the prize into the custody of a servant of a commissioner. His delivery must be an actual

one to the lawful substitute of the judge. The custody of the goods or cargo must pass in reality from the prize master to the commissioner, to constitute a legal delivery to the latter, and must be receipted for by him. The rule gives no compensation to the commissioner.for the acts and doings of his servants or employés, independent of his special directions and supervision, so as to constitute the act personal by the officer. It is obvious that the rule contemplates a possession of the seized property purely official, and of the shortest duration practicable, until it is put under the guardianship of legal process. The allowances named are subject to variation, for cause adjudged by the court, in order to keep the compensation in reasonable correspondence with the labor and responsibility incurred.

The proofs in this case show that the commissioner had a mere constructive possession of the cargo, no further, and for no other purpose, than that which is provided for under the standing charge allowed for "taking possession of it, with the papers, and placing his seal upon the hatches," &c. The affidavit given by Perry, the employé of the commissioner, in the first instance, proved no personal services performed by the commissioner in respect to the custody of the cargo. A supplementary deposition made by him on the 7th of January, 1864, and a deposition made by Prize Commissioner Eagle, on the 8th of January, evidently under a misapprehension of dates, state that the commissioners had possession of this cargo, and performed acts for its safekeeping, previous to its being arrested by the marshal. This statement, however, if accepted as further proof, does not show that this was extra duty, entitled to a special compensation, under the principles adopted by the court in the above decisions. But Commissioner Eagle and Mr. Perry are, both of them, in error in supposing that they were in possession of the prize on the first of July. It appears, from the records and proofs in the cause, that the vessel was captured off Wilmington, North Carolina, July 24, and was brought into this port July 28, and was arrested and taken into actual custody, upon the process of attachment, on the same day, by the marshal.

I cannot, upon the evidence before me, regard the commissioner as entitled to have taxed any part of the item charged for "custody fees," amounting to $2,027.41. If application is made to permit further proofs to be given formally by the commissioner in support of that item, such privilege will be allowed, under a like power to any other party interested in the funds, to offer counteracting proofs; and evidence will also be allowed to be given by any party in interest, tending to determine whether it be necessary and lawful, for the satisfaction of salary due the commissioner for the year following the custody of this prize, that any portion of the item in question, or of other

surplus commissions remaining in court, be appropriated to satisfy such arrearage. In case such power and necessity exist, it, doubtless, is within the competency of the court to rate such a proportionate allowance toward such deficiency as may, under all the considerations, be found to be reasonably proper for that purpose.

In arranging the tariff of charges, the court took into consideration the probability that the prosecutions, on the success of which the compensation of these officers is dependent, would occasionally be defeated, or fail to yield proceeds adequate to their satisfaction; and, accordingly, the estimates were framed with a view to meet such deficiencies. Moreover, the bills up to July 17, 1862, were allowed in contemplation of the payment of $6,000 per annum to each commissioner. Since the passage of the act of limitation of that date, the prospective assessment on prize proceeds should be diminished accordingly whenever the court is satisfied that the confiscation may be carried into effect, so as to secure their compensation to the commissioners upon a lesser rate of allowance out of the fund.

[For other cases concerning the Merrimac, see Cases Nos. 9,475 and 9,476.]